OPINION
{¶ 1} Appellant-mother RayAnn Craig and appellant-father Allan Craig separately appeal from the decision of the Tuscarawas County Court of Common Pleas, Juvenile Division, which granted permanent custody of three minor children to appellee Tuscarawas County Job and Family Services.
 STATEMENT OF THE FACTS AND CASE {¶ 2} On July 27, 2004, Tuscarawas County Job and Family Services (hereinafter "agency"), with assistance from local law enforcement officials, took emergency custody of four minor children namely, Jazmine Irwin Lloyd (DOB 1/21/99), George Irwin (DOB 2/15/01), Rebecca Craig (DOB 7/29/02), and Allan Craig, II (DOB 7/6/03). Appellant Alan Craig, Jr. (hereinafter "appellant-father") is the biological father of two of these children, Rebecca and Allan, whereas Craig's spouse, appellant RayAnn Craig, is the biological mother (hereinafter "appellant-mother") of all of the children.
 {¶ 3} The day following the children's removal, the agency filed a complaint alleging the children were abused, neglected and dependent. The complaint alleged that appellant-father had abused Rebecca Craig and repeatedly subjected the four minor children to inappropriate physical discipline and that appellant-mother and appellant-father failed to adequately care for and supervise the minor children. The agency requested temporary custody of the children. The trial court conducted a shelter care hearing that same day and ordered all four children into the temporary custody of the agency.
 {¶ 4} Following trial, the trial court, pursuant to a Judgment Entry dated October 13, 2004, found the children to be neglected and dependent. The trial court dismissed the abuse allegation. At a dispositional hearing conducted on October 22, 2004, the trial court continued the children in the temporary custody of the agency and adopted the case plan proposed by the agency.
 {¶ 5} Subsequently, on June 24, 2005, the agency filed a motion seeking permanent custody of George Irwin, Rebecca Craig and Allan Craig II.[1] The agency, in its motion, alleged that both appellant-father and appellant-mother had failed to substantially engage in case plan services. The following testimony was adduced at the trial held on October 28, 2005.[2]
 {¶ 6} Elizabeth Wanosik, a case worker with the agency, testified that she had been the ongoing case manager for the minor children since the case was opened. Wanosik testified that the children had been placed into foster care in July of 2004 and had remained in the agency's custody since such time. Wanosik testified that as part of the reunification plan in this case, a case plan was prepared for appellant-mother that included parent education and confrontive therapy, which had been recommended after a psychological evaluation. The case plan also required appellant-mother to undergo a psychiatric evaluation, to maintain stable housing and to have no pets in the home.
 {¶ 7} According to Wanosik, appellant-mother was referred to and signed up for parent education services three times. Wanosik testified that she discussed case plan services with appellant-mother during her office visits with appellant-mother. The following is an excerpt from Wanosik's trial testimony:
 {¶ 8} "Q. Um, were, was Miss Craig referred to parent education services at Job and Family Services?
 {¶ 9} "A. Yes.
 {¶ 10} "Q. How many times?
 {¶ 11} "A. Three times.
 {¶ 12} "Q. Okay, and did that consist of simply you just mailing a letter to her last known address or did you ever talk to her about that?
 {¶ 13} "A. It was discussed on office visits with Rayann and when I would go over case plan services with them.
 {¶ 14} "Q. Okay, so it wasn't a case where she couldn't have known that it was available or how to do it?
 {¶ 15} "A. Right.
 {¶ 16} "Q. Did you talk to her about that one time, more than one time?
 {¶ 17} "A. Um, specifically I can't give you a number, but on several occasions, just anytime that I would meet with my parents I try to review what's on the case plan and see where they're at with services.
 {¶ 18} "Q. Okay. In fact, wasn't there a Court hearing where it was requested that the Agency set that up for them the fourth time?
 {¶ 19} "A. Yes.
 {¶ 20} "Q. Okay, and at that point in time the Agency didn't waste time or space for those folks, is that right?
 {¶ 21} "A. Correct.
 {¶ 22} "Q. Okay. Those three separate times they were referred, um, for what reason did they not complete the program?
 {¶ 23} "A. I really don't have, don't know. Um, I really wasn't given an explanation for why.
 {¶ 24} "Q. Okay, did Rayann Craig come to you and say I didn't get a letter, I didn't know I was suppose to do it, how do I go about this?
 {¶ 25} "A. There was one occasion, I don't know which, which referral it was, but she had said, because I know I had talked to her about it, she said they didn't get the letter. That, what she would have reported was, um, that the neighbors were stealing their mail.
 {¶ 26} "Q. Okay, and this was one time out of the three separate times you referred them to the program?
 {¶ 27} "A. Yes.
 {¶ 28} "Q. Did, uh, she ever come to you and ask you what she had to do to get into the program, what she had to do to complete that service?
 {¶ 29} "A. No.
 {¶ 30} "Q. Okay, did she ever show any initiative with you to try and get some assistance in doing any of these services?
 {¶ 31} "A. No.
 {¶ 32} "Q. Okay. So that portion of the case plan, to the best of your knowledge, was never complied with?
 {¶ 33} "A. correct." Transcript at 79-81.
 {¶ 34} At the trial, Wanosik further testified that, with respect to the confrontive therapy requirement, appellant-mother only attended two appointments at Community Mental Health in July of 2005 and that, during the appointments, she denied having any mental health issues. Wanosik further testified that appellant-mother failed to have a psychiatric evaluation performed even though she had been advised to do so during her nearly monthly meetings with Wanosik. With respect to the issue of stable and safe housing, Wanosik testified that appellant-mother and appellant-father had moved several times, including in August of 2005. Wanosik testified that she was not concerned with the cleanliness of the trailer in which the couple was residing as of the time of the trial. However, when asked whether the appellant-mother and appellant father historically had been able to maintain a clean residence without the children there and then have it deteriorate when the children were present, Wanosik answered in the affirmative.
 {¶ 35} As is stated above, the case plan also prohibited appellant-mother and appellant father from having pets in their home. Wanosik testified that the Guardian Ad Litem had requested such requirement after observing numerous pets and dog feces and urine in the house. Wanosik further testified that there was one dog in the house and three outside and that appellant-mother was advertising that she had puppies for sale.
 {¶ 36} Wanosik was next questioned about appellant-father. Appellant-father`s case plan included parent education classes and long term anger management counseling. As part of his case plan, appellant-father also was required to undergo psychiatric evaluation and psychological evaluations and to maintain safe and stable housing and was prohibited from having pets in the home. Wanosik testified that she had been unable to discuss case plan services with appellant-father since, during her meetings with him, he refused to look at her or speak to her and refused to sign any type of releases despite repeated requests to do so. Wanosik testified that appellant-father was referred to parent education classes three times, but that he refused to complete the classes and would not discuss the same with her.
 {¶ 37} At the trial, Wanosik was next questioned about the second requirement for long term therapy for anger management. She testified that appellant-father previously received some counseling with respect to an earlier case, but that she was unaware of any counseling during this case and that it was difficult for her to determine if appellant-father had completed counseling due to his refusal to sign a release for her to find out. Wanosik further testified that, to her knowledge, appellant-father had failed to undergo a psychiatric evaluation. He had, however, completed a psychological evaluation in August of 2005. The psychological evaluation, which was admitted at trial, diagnosed appellant-father with features of narcissistic, antisocial and paranoid personality disorders.
 {¶ 38} According to Wanosik, appellant-father had not visited with the children since December 7, 2004. She testified that his visits with the children were initially stopped after Jazmine reported some allegations of sexual abuse, which the agency investigated. Over objection, Wanosik testified that the investigation found evidence of sexual abuse although appellant-father was not prosecuted for the same. The following is an excerpt from Wanosik's testimony:
 {¶ 39} "Q. Now Mr. Craig has not visited with these children then for eleven months as you indicated earlier?
 {¶ 40} "A. Yes.
 {¶ 41} "Q. Okay. With regard to the five elements in the case plan you testified about earlier, has he ever put forth any effort on any of those to lead you to come forward and ask the Court to let him start visiting?
 {¶ 42} "A. No.
 {¶ 43} "Q. Have you personally observed any visits between, um, either of these parents and the children?
 {¶ 44} "A. Yes.
 {¶ 45} "Q. Okay, anything consistent then?
 {¶ 46} "A. No.
 {¶ 47} "Q. Okay, so you're really not the best person to comment on, un, those visits or what's taken place in them?
 {¶ 48} "A. No.
 {¶ 49} "Q. Okay. So you're very clear, Miss Wanosik, um, your testimony today is that Mr. Craig basically didn't complete any portions of the case plan whatsoever?
 {¶ 50} "A. Correct." Transcript at 99-100. When asked, Wanosik testified that she was basing her request for permanent custody based "for the most part" on appellant-father's failure to comply with his case plan.
 {¶ 51} At the trial, Debbie Whitney testified that she had been employed as a family service aide with Children's Services from February of 2001 until August of 2005 and that she supervised visitation between appellant-mother and appellant-father and the children from August of 2004 until October of 2004. Whitney testified that appellant-father behaved in a bizarre manner during his visits with the children and would jump at the children, grab and hiss at them, and tended repeatedly to intentionally frighten them. She further testified that appellant-father was rough with the children and dismissed Whitney's concerns over how he interacted with them.
 {¶ 52} Whitney also testified that she resumed supervising visitation between appellant-mother and the children in March of 2005 and that appellant-mother was more cooperative alone than she was when she was with appellant-father, who tended to be sarcastic during visitations.
 {¶ 53} Valerie Garbrandt, a licensed foster parent, testified that two of the children, Jazmine and George, had been in her home for over a year while the other two children had been in her home since June. Garbrandt testified that Jazmine and George were scared and anxious after their weekly visits with appellant-father and that once such visitation stopped, the two children were more relaxed and not as scared. According to Garbrandt, the two childrens' behavior improved immediately after visitation with appellant-father stopped.
 {¶ 54} Pursuant to a Judgment Entry filed on October 31, 2005, the trial court ordered that George Irwin, Rebecca Craig and Allan Craig, II be placed in the permanent custody of the agency. The trial court, in its entry, stated, in relevant part, as follows:
 {¶ 55} "The Case Plan proposed by the Tuscarawas County Job and Family Services addressed the concerns which resulted in the removal of the children. Each element of the Case Plan had supportive services offered by the Tuscarawas County Job and Family Services to help in the completion of the Case Plan. These parents have demonstrated a lack of commitment toward their children and have failed to provide an adequate home for the children at this time and cannot do so within a year of this litigation."
 {¶ 56} Appellant-father now appeals from the trial court's October 31, 2005, Judgment Entry, raising the following assignments of error in Case No 2005 AP 11 0076:
 {¶ 57} "I. THE APPELLANT WAS DENIED THE DUE PROCESS OF LAW WHEN THE COURT CONSIDERED AS EVIDENCE AT THE PERMANENT CUSTODY TRIAL ALLEGATIONS OF SEXUAL ABUSE WHICH WERE NOT BROUGHT UP AT THE INITIAL ADJUDICATION AND FOR WHICH NO ADJUDICATORY HEARING WAS HELD.
 {¶ 58} "II. THE TRIAL COURT ABUSED ITS DISCRETION IN FINDING THAT THE APPELLEE HAD PROVIDED REASONABLE EFFORTS IN ATTEMPTING TO REUNIFY APPELLANT WITH HIS CHILDREN."
 {¶ 59} Appellant-mother also appeals from the trial court's October 31, 2005, Judgment Entry, raising the following assignments of error in Case No 2005 AP 11 0079:
 {¶ 60} "THE AGENCY FAILED TO SATISFY IT [SIC] BURDEN UNDER SECTION 2151.419 OF THE OHIO REVISED CODE OF PROVING THAT IT HAD MADE THE NECESSARY REASONABLE EFFORTS TO MAKE IT POSSIBLE FOR THE CHILD TO RETURN HOME."
 {¶ 61} The two cases have been consolidated for merit review. While a Notice of Appeal from the trial court's October 31, 2005, Judgment Entry also was filed by the maternal grandparents and assigned Case No. 2005 AP 11 0083, no briefs have been filed in such case, which was consolidated with the above two cases.
 Case Nos. 2005 AP 11 0076 and 2005 AP 11 0079 {¶ 62} Appellant-father, in his second assignment of error in Case No. 2005 AP 11 0076, and appellant-mother, in her sole assignment of error in Case No. 2005 AP 11 0079, argue that the trial court erred in finding that the agency had made reasonable efforts to reunify the minor children with them and to make it possible for the children to return home. We disagree.
 {¶ 63} Children services agencies are statutorily required to develop case plans for children in their custody and the case plans should include objectives for each of the child's parents. R.C. 2151.412. Thus, when the agency files a complaint requesting permanent custody, a trial court must determine whether the agency made reasonable efforts to return the child to the parents before it authorizes the removal of the child. In re Wright,
Ross App. No. 01CA2627, 2002-Ohio-410, at 8. This requirement is applicable regardless of how long the child has been in the agency's temporary custody. Further, the agency has the burden of proving that it made reasonable efforts. R.C. 2151.419(A)(1). A "reasonable effort" is ". . . an honest, purposeful effort, free of malice and the design to defraud or to seek an unconscionable advantage." In re Weaver (1992), 79 Ohio App.3d 59, 63,606 N.E.2d 1011.
 {¶ 64} When a trial court is considering whether the agency made reasonable efforts to prevent the removal, the issue is not whether the agency could have done more, but whether it did enough to satisfy the reasonableness standard under the statute.In re Brewer (Feb. 12, 1996), Belmont App. No. 94-B-28, at 3. "In determining whether reasonable efforts were made, the child's health and safety shall be paramount." R.C. 2151.419(A)(1).
 {¶ 65} Based upon our review of the record, we concur with the trial court that the agency made reasonable efforts to reunify appellant-mother and appellant-father with the children. As is set forth in detail above, both were given case plans to follow. However, despite her case plan, appellant-mother failed to complete parent education classes even though she was signed up and enrolled in such classes on three separate occasions. While appellant-mother contends that Elizabeth Wanosik, her case worker, "did not make the best effort to facilitate completion of the parenting classes", Wanosik testified that she discussed the requirements of the case plan with appellant-mother during their meetings. According to Wanosik, appellant-mother did not ask what she had to do to complete the parenting education classes and showed no initiative in trying to obtain assistance in order to do so. Moreover, appellant-mother also failed to have a psychiatric evaluation and had pets in her home although prohibited from doing so over concerns about cleanliness. As noted by the trial court in its entry, appellant-mother "has not been able to follow through on her case plan goals despite repeated referrals for the same services."
 {¶ 66} Furthermore, while appellant-father contends that the agency failed to set forth reasonable efforts to enable him to reunify with his children since it denied him visitation following allegations of sexual abuse,[3] the record clearly establishes that he failed to comply with the case plan prepared for him and was uncooperative, refusing to talk to Elizabeth Wanosik or to sign releases enabling her to obtain necessary information. At the trial in this matter, when asked, with respect to the five requirements in appellant-father's case plan, whether he ever put forth any effort on any the requirements to lead Wanosik to come forward and ask the trial court to let him restart visitation, Wanosik responded in the negative.
 {¶ 67} Based on the foregoing, we find that the trial court did not err in finding that the agency had made reasonable efforts to reunify the minor children with appellant-mother and appellant-father.
 {¶ 68} The second assignment of error in Case No. 2005 AP 11 0076 and the sole assignment of error in Case No. 2005 AP 11 0079 are, therefore, overruled.
 Case No. 2005 AP 11 0076 {¶ 69} Appellant-father, in his first assignment of error in Case No. 2005 AP 11 0076, argues that he was denied due process of law when, at the trial in this matter, the trial court considered unproved allegations of sexual abuse which were not brought up until after the initial adjudication and for which no adjudicatory hearing was ever held. Appellant-father argues that the agency should have filed a second complaint alleging sexual abuse and proven the same at a second adjudication before limiting his contact with the children and arguing that the alleged sexual abuse was a reason to grant permanent custody.
 {¶ 70} However, we find that appellant-father was not denied due process of law since the sex abuse allegations did not form the basis for the trial court's order granting permanent custody to the agency. The trial court, while noting such allegations in its entry,[4] found that none of the case plan goals had been accomplished by either party and that the parties had failed continually and repeatedly to substantially remedy the conditions that had caused the children to be removed from the home in the first place. The trial court further noted that the parties had demonstrated a lack of commitment toward their children. The trial court, specifically found the following facts to be true by clear and convincing evidence:
 {¶ 71} "1. This is the second dependency/neglect case in which Rayann and Allan Craig were parties.
 {¶ 72} "2. The history of this family is fraught with examples of constant neglect. Home conditions have been inadequate and filthy. The children have been underweight and otherwise physically neglected. The general, physical handling of these small children was rough and inappropriate. There have been allegations of sexual abuse.
 {¶ 73} "3. Despite all the deficits in this family, the fear and anxiety demonstrated by these children when they first came into foster care stands out most.
 {¶ 74} "4. These children are slowly becoming more relaxed and content, initially they appeared to be so scared that they had difficulty playing and sleeping. Jazmine would scream if anyone touched her. They were terrified at night. These children were particularly traumatized and frightened following visits with Allan Craig.
 {¶ 75} "5. Allan Craig has a history of domestic violence and assaultive behavior. He is totally inappropriate with the children, and they are frightened of him. He handled them roughly and intentionally frightens them.
 {¶ 76} "6. Mr. Craig demonstrates no insight into the difficulties that resulted in the removal of these children. He is difficult and belligerent with the employees of TCJFS.
 {¶ 77} "7. Mr. Craig refuses all direction and takes no responsibility for his negative impact on the children."
 {¶ 78} Based on the foregoing, we find that appellant-father's due process rights were not violated since the sexual abuse allegation did not form the basis for the trial court's award of permanent custody to the agency. As is set forth in detail, the record is clear that appellant-father failed to comply with his case plan and that, for such reason, the trial court severed his parental rights.
 {¶ 79} Accordingly, the judgment of the Tuscarawas County Court of Common Pleas Juvenile Division is affirmed.
Edwards, J. Gwin, P.J. and Farmer, J. concur.
 JUDGMENT ENTRY
For the reasons stated in our accompanying Memorandum-Opinion on file, the judgment of the Tuscarawas County Court of Common Pleas, Juvenile Division, is affirmed. Costs assessed one-half to appellant-father and one-half to appellant-mother.
[1] The agency, in its motion, sought an order granting a six month extension of its temporary custody of Jazmine Irwin-Lloyd on the basis that her father, Tim Lloyd, had substantially complied with his case plan and was working on reunification with her.
[2] At the October 28, 2005 trial, David Brown, the father of George Dean Irwin, stipulated to the motion for permanent custody as it pertained to his son.
[3] Both appellant-father's and appellant-mother's visitation was suspended in December of 2004 after the allegations. While appellant-mother's visitation was reinstated, appellant-father's was not.
[4] The trial court noted that while the agency suspected that appellant-father had sexually abused Jazmine, no prosecution had resulted.